LOTTINGER, Judge.
This is a tort action instituted by Julia Harris and her husband, Joe Harris, against Highland Mortgage Corporation and Emile G. Ezell, d/b/a Ezell Plumbing & Heating arising out of an alleged assault, battery and invasion of plaintiffs’ privacy which took place on or about Friday, February 9, 1962.
Previous to trial plaintiffs moved for a dismissal of their action against Highland Mortgage Corporation as of non-suit. Trial was had contradictorily with Ezell following which judgment was rendered in his favor. The plaintiffs have appealed
The issue presented on this appeal is purely factual. The record reflects without question that plaintiffs were indebted unto Ezell and that whatever took place arose when the latter visited their home on February 9, 1962, with respect to that indebtedness. Following is the pertinent part of the testimony given by Julia Harris:
“Q. What happened to you in February of this year concerning Mr. Ezell? I want you to tell the judge.
“A. Mr. Ezell came out to my home and he knocked and I was in the kitchen fixing a snack for the children and he knocked and I asked who it was and he wouldn’t tell me who he was and he knocked again and I said, well, who is it, and he wouldn’t tell me who he was, and he knocked again and I said, well, who is it, so I went to the door, peeped through the curtain to see who it was, and just at that time Mr. Ezell snatched my screen open and tore it and come into my house and said that he was going to kill Joe, and knocked me down on the floor, and he took his foot and he kicked me. He said, ‘I’m going to kill Joe, and I said, oh, Mr. Ezell, don’t kill Joe, I say, I need Joe, and I said, my child needs Joe, and I said, please, don’t kill Joe, and I pleaded to Mr. Ezell, and then I went to get up by the chair and pulled up some and turned the chair, and I said, bring me the phone and let me call the law. He said, call the law, Mr. Ezell is not *598 scared of no law, call him, go ahead and call him, do you want me to call him for you. And just at the time he said that I said, I told the children (the children told me to call the law) to give me the phone, and when I went to go to call the law, he say, call them, Mr. Ezell is not scared of no law, go ahead and call them. He say, I’m going in this house to get Joe, he’s in there, and I said, no, sir, Joe ain’t there, and I begged and plead with Mr. Ezell until I got Mr. Ezell outdoors, and when I got Mr. Ezell outdoors this other little fellow what was with Mr. Ezell run back to the car and say, I’m going to throw a bomb in that house, and he used some bad language but I don’t want to use the language that he used, and he come back to the door to throw the bomb and I said, oh, don’t throw the bomb in my house, and just at that time I slammed my door, and they stood outdoors raising sand and then come back to my door and shook the knob on my door to come back inside but I hooked it.
“Q. And what happened then?
“A. They went on out toward the car, went out toward the street, and just at that time one of my neighbors came up and they saw my neighbor and run and got in the car and left.”
The neighbor referred to above was not produced as a witness by the plaintiffs. Joe Harris testified that he was not at home when the incident took place.
Calvin Bailey, Jr. testified that he worked as a cook in the Baton Rouge General Hospital and left his year and a half old child with the Harris’ who ran a nursery. He gave the following testimony:
“Q. Will you tell the judge what you saw on that day, please ?
“A. That evening I went by to pick up my little girl from the nursery, well, there were two men coming out from the house and one of them had a gun in his hand, and I just kept on by and made the block and come on back around to the house to pick her up, and when I came back to the house Mrs. Harris told me that those two men forced their way into the house, and I could see where the screen door was busted loose and dragging.
“Q. Was the screen door busted loose that morning when you delivered your child?
“A. No, it wasn’t.”
Bailey testified further that when he saw the two men leaving Julia Harris’ house, he was driving at about 35 mph in a northerly direction. He also stated that there was a truck on the right hand side of the road and a car parked on the same side as the Harris house. He was unable to describe with any detail the type of gun which he saw.
The defendant, Emile G. Ezell, gave the following version of what transpired:
“A. Well, I went to the Harris residence in 1962 with Mr. Gibson twice, and we drove up in front of the Harris residence on 45th Street and stopped, the first time, and got out and went to the door and knocked on the door, and there was a woman who came to the door, and when we asked her her name she said her name was Bea Harris, and I asked where Julia Harris was, and she said Julia was on the west coast and then I asked her where Joe was and she said Joe was dead. I told her who I was and explained to her that we had come to see about the account which was long, which was long past due. We talked for a few minutes and we left, and then a few days after that I happened to find out from another source that the woman I talked to was Julia Harris and I happened to *599 find out also that Joe was not dead, he was living in the house. So on ¡getting this information, I drove back ■out there by myself and I was going to stop and check with them and see if she wouldn’t tell me the truth, ■but when I got there there was a red Ford automobile sitting in the yard, and I wrote the license number down. I didn’t stop, I mean, I stopped long enough to get the license number and I went on. I came back to my ■office and I called the State of Louisiana License Bureau and they fold me that that car was registered in Joe Harris’ name, and then I was positive Joe was not dead, and so I got Mr. Gibson then — I don’t believe we went that same day, I think it was the following day right after lunch, to go back to the Harris residence with me. We drove up, we parked our car in front of the house and the same red Ford was in the yard at that time, and we knocked on the door and this woman came to the door again and answered the door, and I told her, I said, Julia, and she said, oh, no, this is Bea, and I said, Julia, I’m Mr. Ezell, and I said I know that you’re, that you’re Julia, but up on the — let me go back now a little bit. When I first found out that this car was registered in Joe’s name, the same day that I found that out I had Mr. Gibson call Joe’s House, we had their phone number, and I had him call Julia’s house and ask for Joe and he told them that he was with the license bureau and there was some, they was having some difficulty checking his license number and they wanted to talk with him, and she put Joe on the phone, and he talked to Joe. And then the next day Mr. Gibson and I— I wanted to find out if he was really living or if he was actually dead. The next day Mr. Gibson and I went out to the house after lunch. We parked in front of the house and we got out of our car, walked to the door and knocked and Julia answered the door and I called her by name, I said, hi, Julia, and she said, this is Bea, and I said, Julia, I said, I happen to know that your name is Julia Harris and I happen to know Joe is not dead, and I said, I want to discuss this account with you, and that’s about as far as I got. She got— when she knew that I knew Joe was in the house and that he was not dead and she wasn’t on the west coast and that was her standing in that door, she got hysterical and started cursing, and I never heard such language in my life, and she threatened to go in the back of the house and get the gun and shoot us, and all the time that she was doing this cursing she was walking back in the house, and I told Mr. Gibson, I said, son, I said, I just believe we’d better go because I don’t want any trouble, and that is the last time I’ve seen her until we took this deposition.”
Ezell also gave the following testimony:
“Q. Now on the final trip that you went out there in February, it’s your testimony that Mr. Gibson went with you?
“A. Yes, sir.
“Q. Did you have a gun, Mr. Ezell?
“A. No, sir. I never owned a gun in my life, Mr. Bagwell, and I’ve never carried a gun.
“Q. Did Mr. Gibson have a gun?
“A. No, sir.
“Q. Did you have anything at all in your hand and, if so, what?
“A. I had their payment card, the account card. That’s all I had.
“Q. Did you all have a bomb along with you?
“A. No, sir.
*600 “Q. Or any machine guns or anything like that?
“A. No, sir, we wasn’t armed.
“Q. No arms whatsoever?'
“A. No, sir.
“Q. Did you ever at any time enter into the residence of Julia Harris?,
“A. No, sir.
“Q. Who did you see there?
“A. Julia is the only person I saw.
“Q. And she was the only one that came to the door?
“A. Yes, sir.
“Q. And she insisted even then that her name was Bea Harris?
“A, Right, yes, sir.
“Q. And that is the same Julia Harris that sits back here and says that she was Bea Harris?
“A. That’s right.
“Q. And it is your testimony that at no time did you ever step inside her door?
“A. No, sir, I never did.
“Q. Did she create much of a commotion ?
“A. Well, I would say she did, Mr. Bagwell. She went — it seemed as though she was out of her mind, she went hysterical.
“Q. Was she talking loud, or—
“A.- Yes, sir.
“Q. —was she using good or profane language ?
“A. Profane.
“Q. And you attempted in no manner to retaliate?
“A. No, sir.
“Q. And its’ your testimony that at that -time you and Mr. Gibson went hack to your car and left the premises?
“A. Yes, sir.”
Harold R. Gibson, Jr. testified as follows
“Q. Who did the talking with her?
“A. Mr. Ezell.
“Q. And where were you all at the time you were asking these questions ?
“A. We were standing right in front,, front of the house, in front of the door.
“Q. Did the house have a porch on it?'
“A. No, sir.
“Q. It had a door, and did it have a screen door?
“A. Yes, sir.
“Q. Was the seeren door latched or not?
“A. I can’t recall, sir.
“Q. Mr. Gibson, when you all decided to go out there, did either you or Mr. Ezell take any side arms or guns and, if so, what type did you take with you?
“A. We didn’t take any side arms or guns.
“Q. You didn’t see any gun out there?
“A. No, sir.
“Q. Did you see Mr. Ezell with a gun?
“A. No, sir.
“Q. Does Mr. Ezell have a gun in his office?
“A. No-, sir.
“Q. Plave you ever seen him with a. gun at his office?
*601 '“A. No, sir.
■“Q. Did either one of you, that is you or Mr. Ezell, have anything at all in your hand, and, if so, what?
"A. Mr. Ezell had a card in his hand, account card.
■“Q. What size card did it appear to be?
"A. Oh, five hy six, five inches by six.
“Q. Did Julia ever at an y time admit that she was Julia Harris ?
“A. No, sir.
“Q. Now, Mr. Gibson, did you have a bomb out in your car?
“A. No, sir.
“Q. Did you ever at any time return . to the car from the time you reached that residence until you left?
“A. No, sir.
“Q. Approximately how long were you all at the Harris residence?
“A. Oh, two or three minutes, not too long.
“Q. Who, if either of you, ever entered the Harris residence?
"A. No one ever entered.
“Q. No one ever entered the resident?
"A. No, sir.”
Mr. Gibson testified that he measured the distance from the Harris house to the fence in front of it and found it to be 31(4 feet. He testified that the distance from the fence to the street is 14 feet and that the street measured 17(4 feet in width.
As stated before, the issue presented is factual and, moreover, largely dependent upon the veracity of the witnesses. This factual question was resolved adversely to the plaintiffs in the court below and we find absolutely nothing in the record which would show manifest error or warrant a reversal thereof.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.